UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff(s), ) | |
| ) | |
| vs. ) | Case No. 1:11CR 82 CEJ |
| ) | |
| THOMAS E. NOLAN, ) | |
| ) | |
| Defendant(s). ) | |

## REPORT AND RECOMMENDATION

Defendant Thomas E. Nolan has filed Defendant's Motion to Suppress Statements and Evidence (Document #37) in which he asks for an order suppressing any evidence obtained through a search or seizure as obtained in violation of the Fourth Amendment of the United States Constitution and any evidence in the form of statements made by the defendant which the government intends to offer as evidence at trial. He contends that statements were obtained in violation of the defendant's Fourth, Fifth and Sixth Amendment rights. (Document #37, p. 1).

### Factual Background

On Thursday, June 9, 2011, a federal search warrant was executed at the residence of Thomas E. Nolan, located at 41 North Henderson, Cape Girardeau, Missouri. The search warrant was secured as the result of an investigation concerning violations of child exploitation laws that were believed to have been committed by Thomas E. Nolan. In addition, prior contacts that law enforcement officers had with Nolan approximately eleven years earlier led officers in the recent investigation to believe that Nolan may also have firearms and ammunition in his residence.

Prior to the execution of the search warrant, during internet undercover operations on May

6, 2011, someone using a computer at Nolan's residence had been involved in the possession and transportation of child pornography. This information was gathered by Lt. Chris Mateja, the supervisor of the Cyber Crime Unit for the St. Charles County, Missouri, Sheriff's Department. Lt. Mateja utilized what is known as the Internet Crimes Against Children database on May 6, 2011, and identified a computer in the state of Missouri, IP address of **97.87.119.69**, that was offering to participate in the distribution of child pornography. Lt. Mateja was able to determine through the use of administrative subpoenas that IP address **97.87.119.69** was subscribed to by Thomas Nolan, 41 North Henderson, Cape Girardeau, Missouri, and that the internet service was provided by Charter Communications.

On May 6, 2011, Lt. Mateja directly connected to and successfully browsed a computer using IP address **97.87.119.69**. During that connection, Lt. Mateja browsed and obtained publicly available files, specifically, four files that have been described by Special Federal Officer Donya Jackson in her application.

According to Special Federal Officer Jackson and Lt. Mateja, the four files were available via a peer to peer file sharing program from a computer using IP address **97.87.119.69** and Lt. Mateja downloaded the four files. Responses to administrative subpoenas revealed that IP address **97.87.119.69** was connected to the Charter internet service account subscribed to by Thomas Nolan on May 6, 2011.

Prior to applying for the federal search warrant for Nolan's residence, a criminal history check identified Thomas Eugene Nolan as a registered sex offender in Cape Girardeau County. Nolan's prior convictions were for Statutory Sodomy - 1st Degree and Child Molestation - 2nd Degree. Nolan was convicted of those crimes in Cape Girardeau County on June 8, 2000. He was sentenced

to a term of 8 years imprisonment for the Statutory Sodomy charge and one year imprisonment for the Child Molestation charge. Nolan was released from prison on June 29, 2009. Additionally, a check with the Missouri Department of Motor Vehicles reflected that Thomas Nolan was issued a non-driver's license identification card with the 41 North Henderson Street address on July 1, 2009, which was scheduled to expire on September 13, 2015. The Missouri Sex Offender Registry also reflected that Thomas E. Nolan's last known address was 41 N. Henderson Street in Cape Girardeau.

On June 9, 2011, at approximately 1:30 P.M., with assistance from the Cape Girardeau Police Department SRT Unit, a federal search warrant was executed at Nolan's home located at 41 North Henderson. When the warrant was executed, the officers knocked and announced their presence. Thomas E. Nolan was present at the residence and answered the door. Officers from the Cape Girardeau Police Department had conducted a search at the same residence eleven years earlier, on May 3, 2000, while Nolan lived there and they found nearly 70 firearms stored in a locked room. That prior contact caused the officers to be concerned that Nolan may still have weapons at the residence and he was handcuffed for officer safety while the residence was being secured.

As the residence was being secured, officers immediately observed multiple items that could be used as weapons throughout the residence, including: a "blow-gun" with multiple darts/needles, a night stick/club and a dagger with attached brass knuckles placed next to the front door. Furthermore, officers observed multiple metal boxes of ammunition and component parts of guns within the residence. In the basement of the residence was an automatic weapon similar to an MP5 machine gun that was ultimately determined to have been rendered unusable. There were also empty wooden boxes marked ammunition and explosives. Officers also seized multiple packages of ammunition in what appeared to be factory original packaging.

As previously stated, Nolan was placed in handcuffs after officers made their initial entry into the residence. The handcuffs, however, were secured on the front of Nolan's person for his comfort rather than behind his back. Special Federal Officer (SFO) Donya Jackson introduced herself to Nolan and explained that the officers were there to execute a federal search warrant for computer-related items. SFO Jackson told Nolan that even though he was in handcuffs, he was not in custody and further explained that the handcuffs were being used for officer safety reasons. Nolan was seated in the living room of his home and SFO Jackson asked Nolan if he would like to speak with her at the police department about the search warrant. Nolan indicated that he would rather be interviewed at his residence. Based on that response, SFO Jackson retrieved some items from her vehicle while Nolan reviewed the search warrant.

When SFO Jackson returned, she read the <u>Miranda</u> warning to Nolan and reminded him that he did not have to speak to her. Nolan appeared to understand his rights as they were read to him and he signed a <u>Miranda</u> waiver form (introduced at the evidentiary hearing as Government Exhibit #2). Nolan also stated that there may be questions that he would not want to answer without a lawyer present and SFO Jackson responded that he could end the interview at any time, or choose to not answer certain questions. Nolan agreed he wanted to participate in an interview. SFO Jackson clarified the search warrant was related to child pornography that may be in the house and on any computer items. Nolan responded that he'd seen child pornography files on his computer but did not want them and would delete them.

During the interview, Nolan stated that he had many knives but that he had disposed of all of his guns and that any of the ammunition in the home was unusable. Nolan claimed he had nothing that would be considered illegal as a previously-convicted felon. Later in the interview, Nolan stated

that he had been a gun dealer at one time but that the guns he previously owned were stored with his parents in Illinois and other places. Nolan stated that his parents were supposed to have removed all weapons from his residence before he returned from prison two years earlier. Nolan stated that anytime he came across any ammunition or gun components, he would call his mother to retrieve such items since he knew he could not possess them.

Nolan also stated that he was the only occupant of the residence. As far as any computers, Nolan stated he routinely used the computer in the home office but had picked up other discarded computers along the way and tried to make them work. Nolan stated that he has used the computer that was set up in the home office area since he was released from prison two years ago. Nolan also shared that the internet service provider he used during that time-frame was Charter. Nolan stated that he was the primary user of his computer and that it was rare for anyone else to use it. Nolan also gave passwords that he used for his computer to SFO Jackson during the course of the interview.

Nolan was advised that the investigation had shown that over the past year he had downloaded as many as 30 or 40 child pornography files.

During the course of the interview, an on-site forensic exam was being performed on Nolan's computer by Lt. Mateja. The activities of Lt. Mateja were visible from where Nolan was seated in the living room. Lt. Mateja's on-site exam revealed that the computer did contain some files of child pornography. SFO Jackson stated that it would be hard for the investigators or attorneys to believe that he was accidently downloading the files based on the numbers he had downloaded over time. At that point, Nolan stated, "well, I better talk to a lawyer about that."

During the interview, Lt. Chris Mateja entered the room and stated that he found the child pornography bondage images previously downloaded from Nolan on his computer on May 6, 2011.

Nolan strained his eyes to view the computer located in the next room and he was told that he was free to enter the office and get a closer look. Nolan did so and viewed an image that was displayed on the computer screen. Lt. Mateja stated that file was saved in My Documents/My Pictures folder. Nolan stated that he did not know that the minor depicted in the image was underage when he saved it. Lt. Mateja stated that Nolan downloaded the file to the Limewire/Frostwire folder and then chose to save the file in his My Documents folder. All computers and computer media were seized for full forensic examination.

SFO Jackson advised Nolan that based on his comment about needing to talk to a lawyer regarding how he could have accidentally downloaded the child pornography on his computer– although he did not specifically ask for or request a lawyer– and the fact that he was found to be in possession of child pornography, the interview was being terminated.[1] While the interview was stopped, the search continued and Nolan later asked SFO Jackson if there had been any trouble with the search upstairs. SFO Jackson advised Nolan that gun-related evidence was found upstairs.[2] SFO Jackson prepared a Memorandum of Investigation regarding the case, which in part memorializes Nolan's statements. That report was introduced at the hearing as Government Exhibit #3.

As a result of the evidentiary items found during the search, Nolan was arrested on a state distribution of child pornography and gun possession charges.

The defendant seeks to suppress any and all evidence seized on June 9, 2011, as well as any

---

[1] See footnote 3 below.

[2] Officer Jackson walked upstairs to see what other evidence was being seized. She then called the Assistant United States Attorney and spoke with her. "He was in possession of multiple ammunition rounds and component pieces, so it was my determination at that point that I would place him under arrest or that we would continue our investigation for that." (Tr. 24-25).

statements he made that day.

The Factual Background above is excerpted from the statement of FACTS in the Government's Response to Defendant's Motion to Suppress Evidence and Statements (Document #42) which in turn draws heavily from Officer Jackson's Memorandum of Investigation (Government's Exhibit #3) which was entered into evidence at the evidentiary hearing.

## Discussion

Defendant contends that with reference to his statements made during the interview on June 9, 2011, with Officer Donya Jackson, they were made when he was unlawfully in custody, his statements were not voluntary and any waiver of his rights under Miranda was not knowing and voluntary.

The physical evidence in the case was seized pursuant to a search warrant issued by the court on an affidavit of Donya Jackson, an investigator with the United States Attorney's Office and Special Federal Officer with the FBI. Defendant contends the affidavit is insufficient to show probable cause and was unprotected by the good faith exception to the exclusionary rule for judicially authorized searches.

In his post-hearing Memorandum in Support of Motion to Suppress Statements and Evidence Obtained in Search or Seizure (Document #49), the defendant acknowledges that the transcript reflects that warning of his rights was given in written form and the government's exhibit reflects an acknowledgment of the rights having been provided and waived. Testimony by Special Federal Officer Donya Jackson also indicated that no coercion, express or implied, was made to obtain Mr. Nolan's response to the questioning which occurred. The testimony also reflected that none of the interview was memorialized contemporaneously in the form of a recording. (Id., p. 1, 2).

Defendant argues that the interview should have been recorded as a matter of 21st Century Due Process and since it was not, it should be excluded from admissible evidence. The defendant refers to two state cases which have required the recording of self-incriminating statements taken by law enforcement from suspects: <u>Stefan v. State</u>, 711 P.2d 1156 (Alaska 1985) and <u>State v. Scales</u>, 518 N.W.2d 587, 592 (Minn. 1994). Defendant does acknowledge that the Federal Courts of Appeals have not yet adopted this requirement, citing cases from the Seventh Circuit, Third Circuit, the First Circuit and the Eighth Circuit.

Defendant cites the recent United States Supreme Court case of <u>United State v. Jones</u> (No. 10-1259), which requires a search warrant before a GPS tracking device may be installed on a vehicle. Defendant wants to apply the reasoning in the <u>Jones</u> case to the present situation in which Lt. Mateja downloaded from the defendant's computer the images described in the Affidavit in support of Officer Jackson's Application for the Search Warrant. Defendant contends Lt. Mateja invaded the privacy of Mr. Nolan when he downloaded the images. As the defendant states, "Mr. Nolan contends that this intrusion into his personal papers or effects without a warrant was unlawful and without which the search warrant affidavit did not contain probable cause and because of which the good faith exception does not protect the fruits of the search from suppression."

As the court understands the defendant's grounds for suppression of statements and physical evidence, they are:

    1. Defendant was unlawfully in custody when the interview with Officer Jackson was conducted that his statement was not voluntary and his <u>Miranda</u> warning was not knowing and voluntary.

    2. The search warrant was invalid because the affidavit supporting it did not

state probable cause.

    3. The interview should have been recorded.

    4. The unloading of the child pornography from defendant's computer by Lt. Mateja was an invasion of privacy and required a search warrant.

The court will discuss these claims in order.

### Was Thomas Nolan in unlawful custody when the interview took place? Were his statements voluntary and was the waiver of his rights knowing and voluntary?

It appears the basis for the defendant's argument that the defendant was in "unlawful custody" is the fact that he was in handcuffs when he was interviewed. He was placed in handcuffs when the Cape Girardeau Police Tactical Team made a security sweep. Officer Jackson believed that step was part of the tactical team's protocol. (Tr. 10). "I believe they would handcuff anyone." Id. Officers may take such measures as are necessary during the execution of a search warrant to preserve the status quo. This is true in the present case for two reasons: 1) to allow the search to be accomplished without interference ; and 2) for officer safety. The second reason was especially strong in Mr. Nolan's home situation. When officers of the Cape Girardeau Police Department had visited the same home previously, Mr. Nolan was "in possession of well over 70 guns." (Tr. 8). In addition, Officer Jackson testified, "There were multiple weapons by the front door. There was a blow gun that was attached to a bookcase. There was a nightstick immediately to the righthand side of the door as you were facing the door, out to the street. And there was attached to, like, a dagger knife all right there within two feet of the front door." (Tr. 10). Under these circumstances, it was entirely proper to leave Mr. Nolan in handcuffs for officer safety.

After Officer Jackson made the initial contact with Mr. Nolan stating who she was and the

purpose of the search warrant, Mr. Nolan agreed that he wanted to talk with the officer. (Tr. 12). Officer Jackson gave Nolan a copy of the search warrant to read while she retrieved her file and note pad.

Mr. Nolan was seated in a chair in the living room. Officer Jackson sat down on the couch across from him. Officer Jackson told Mr. Nolan she needed to read him his constitutional rights and she read the Miranda warnings. (Tr. 13). Mr. Nolan read along with Officer Jackson from a form. He appeared to understand the rights. He responded appropriately when she read the rights. He indicated he understood the rights. Officer Jackson believed Mr. Nolan agreed to speak with her. Below the statement of rights in the form (Government's Exhibit #2), following the WAIVER is the following:

> I understand my rights. I am willing to answer questions and make a statement, knowing that I have these rights. I do not want a lawyer, at this time. I understand and know what I am doing. No promises have been made to me. No threats have been made against me. No pressure of any kind has been used against me. No promise of reward or immunity has been made.

Then followed Mr. Nolan's signature as the consenter and Officer Jackson's signature as the witness. (Tr. 14).

An important understanding was reached about the interviews:

> Immediately after he signed the consent form, he did say to me there may be questions that he would want to speak to a lawyer about prior to answering, and I informed him that that was absolutely his right, that was fine, he could tell me what questions he wanted to answer and which questions he did not want to answer, he could stop the interview at any time, he could skip questions, that was completely his choice, and he agreed to speak with me further.[3]

---

[3]This agreement is important in interpreting the meaning of Mr. Nolan's comment about contacting a lawyer on the question of how he could have downloaded so many files of child pornography by accident. Officer Jackson testified "At that point Mr. Nolan had already stated to me that in the course of the end of the interview, he had stated that the – the question I was asking

- 10 -

(Tr. 14-15).

Officer Jackson testified that she did not threaten Mr. Nolan; no direct or indirect promises were made in exchange for his statement; Nolan's responses to Officer Jackson's questions were appropriate; he did not appear to be under the influence of alcohol or any kind of drug; Officer Jackson felt Mr. Nolan was answering the questions voluntarily. (Tr. 15-16).

Officer Jackson prepared a ten-page memorandum of the investigation which memorialized the statements Mr. Nolan made. (Government's Exhibit #3).

During the interview, Mr. Nolan stated that he was the sold resident of the house, that he had been out of prison for approximately two years and he had used a computer that whole two years, that Charter was his internet service provider and that he used Limewire and Frostwire which Officer Jackson testified were peer-to-peer file sharing programs. (Tr. 17).

Officer Jackson estimated the interview lasted about an hour. (Tr. 20). The search ended shortly after that. Id.

Officer Jackson described the tenor of the interview as "very laid back, very cordial, very friendly, that no one raised voices." Id. That atmosphere continued throughout the execution of the search warrant and the time Officer Jackson spent with Mr. Nolan. (Tr. 20-21). Nolan was handcuffed in the front "for his comfort" instead of behind the back "which is typical." (Tr. 21). Officer Jackson moved the handcuffs from the back where the tactical team had placed them to the front.

Officer Jackson testified that if Mr. Nolan had attempted to leave the residence during the

---

him he would want a lawyer for, so I didn't ask him any further questions at that point." (Tr. 40). Although the questioning stopped at that point, in light of the agreement, the court believes Mr. Nolan was not exercising his right to an attorney in general, but only on that line of questioning.

- 11 -

interview, she would have allowed that to happen. He did not attempt to leave the residence at any time during the interview. (Tr. 21).

From the evidence, the court finds the defendant was not in custody when he was interviewed by Officer Jackson.

The court further finds the defendant's statements during the interview were voluntary following the administration of the Miranda warnings.

The court finds the defendant's waiver of his rights under Miranda was voluntary and was made with understanding of what those rights were.

Even if a higher court were to find that the defendant was in custody during the interview, before the questioning began, the Miranda warnings were read to the defendant, he acknowledged them and signed the waiver of those rights. Thus, the custody issue does not argue against the voluntary character of the defendant's statements or their admissibility, since custody is one of the triggers requiring the Miranda warnings.

## Probable Cause

### The Search Warrant Was Supported by an Affidavit Which Was Sufficient to Show Probable Cause

In his motion to suppress, the defendant argues the affidavit supporting the application was insufficient to show probable cause. He argues further that the search is unprotected by the good faith exception to the exclusionary clause provided by United States v. Leon, 468 U.S. 897 (1984). (Document #37, p. 3). However, the defendant does not elaborate on what he means.

The United States Supreme Court has defined probable cause to search as "a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S.

213, 238, 103 S.Ct. 2317, 2332 (1983).

The standard to be used by a judge reviewing the decision to issue a search warrant is different from the standard to be used by the judge who issues the search warrant. As the Supreme Court stated in Gates more fully, Id.:

> The task of the issuing magistrate is simply to make a practical, common sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for ... conclud[ing]" that probable cause existed. Jones v. United States, 362 U.S., at 271, 80 S.Ct., at 736.

The Court offered the following caution to reviewing courts, Id. at 236, 2331:

> Similarly, we have repeatedly said that after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of de novo review. A magistrate's "determination of probable cause should be paid great deference by reviewing courts." Spinelli, supra, 393 U.S., at 419, 89 S.Ct., at 590. "A grudging or negative attitude by reviewing courts toward warrants," Ventresca, 380 U.S., at 108, 85 S.Ct., at 745, is inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant; "courts should not invalidate warrant[s] by interpreting affidavit[s] in a hypertechnical, rather than a common sense, manner." Id., at 109, 85 S.Ct., at 746.

Probable cause is

> a fluid concept--turning on the assessment of probabilities in particular factual contexts--not readily, or even usefully, reduced to a neat set of legal rules. Informants' tips doubtless come in many shapes and sizes from many different types of persons. As we said in Adams v. Williams, 407 U.S. 143, 147, 92 S.Ct. 1921, 1924, 32 L.Ed.2d 612 (1972): "Informants' tips, like all other clues and evidence coming to a policeman on the scene, may vary greatly in their value and reliability." Rigid legal rules are ill-suited to an area of such diversity.

Gates, 462 U.S. at 232, 103 S.Ct. at 2329.

The Supreme Court found, 462 U.S. at 231, 103 S.Ct. at 2328, quoting from Brinegar v.

United States (citation omitted), that the probable cause standard is a "practical, nontechnical conception" and "In dealing with probable cause, ... as the very name implies, we deal with probabilities. These are not technical; they are the factual considerations of everyday life on which reasonable and prudent men, not legal technicians, act."

As the Supreme Court stated in Gates, our review of the sufficiency of the affidavits should not take the form of a de novo review.

Officer Jackson's affidavit relates the investigation by Lt. Chris Mateja, Supervisor of the Cyber Crime Unit from the St. Charles County Sheriff's Department. He learned that on May 6, 2011, an internet user at the residence located at 41 N. Henderson Street, Cape Girardeau, Missouri, was in possession, at least in part, of files containing depictions of children engaged in sexually explicit conduct and was offering to participate in the distribution of child pornography to other peer-to-peer (P2P) users. (Affidavit, ¶ 30).

The affidavit explains the peer-to-peer file sharing system as well as Lt. Mateja's background and training.

After directly connecting and successfully browsing the computer located at the IP address of **97.87.119.69.** (Id., ¶ 36), (internet computers identify each other by an Internet Protocol (IP) address. (Id., ¶ 33)), a list of numerous publicly available files was obtained from **97.87.119.69**. Lt. Mateja was also able to download four files from that IP address and referred the case to Officer Jackson for further investigation. (Id., ¶ 36). Officer Jackson listed in the affidavit the descriptions of the four files which the court recognizes as child pornography but will not repeat since the affidavit is in evidence as Government's Exhibit 1A. (Id.).

Officer Jackson utilized an internet tool that determined that Charter Communications holds

the registration on the IP address **97.87.119.69**. A subpoena was submitted to Charter Communications requesting subscriber information for the user of that IP address during the time-frame the files were obtained by Lt. Mateja. (Id., ¶ 37).

Charter Communications identified Thomas Nolan, 41 N. Henderson Street, Cape Girardeau, Missouri, as the subscriber of the IP address during the time-frame the four aforementioned files were obtained by Lt. Mateja. A telephone number, 573-651-4250, was provided for the account holder. (Id., ¶ 38).

A check of public records and the Missouri Department of Revenue conducted by Officer Jackson identified Thomas Eugene Nolan as the resident of 41 N. Henderson, Cape Girardeau, Missouri. (Id., ¶ 39).

A criminal history check identified Thomas E. Nolan as a registered sex offender in Cape Girardeau County for convictions of Statutory Sodomy-1st Degree and Child Molestation-2nd Degree. Nolan was prosecuted and convicted in the 32nd Circuit Court, Jackson, Missouri, on June 8, 2000. He was sentenced to a term of 8 years imprisonment and was released from prison on June 29, 2009. (Id., ¶ 40). On June 7, 2011, Officer Jackson drove past 41 N. Henderson, Cape Girardeau, Missouri, and observed no vehicles in the driveway. A check with the Missouri Department of Motor Vehicles reflected that Thomas Nolan was issued a non-driver's license identification card with the 41. N. Henderson address on July 1, 2009, which expires on September 13, 2015. The Missouri Sex Offender Registry also reflects that Thomas E. Nolan's last known address is 41 N. Henderson Street in Cape Girardeau. (Id, ¶ 42).

The affidavit sets out the information Lt. Mateja obtained pinpointing the offending IP address was that of an internet user located at 41 N. Henderson, Cape Girardeau, Missouri, and downloaded

four images of child pornography being offered to other users. The information Lt. Mateja obtained was referred to Officer Jackson for further investigation. Officer Jackson issued a subpoena to Charter Communications which identified the defendant as the user of the IP address under investigation during the time-frame in question whose address was 41 N. Henderson, Cape Girardeau.

Officer Jackson verified the information she had received from public records and the Missouri Department of Revenue, which revealed that Thomas Nolan was the resident of 41 N. Henderson. She did a criminal records check which revealed the defendant's convictions as a sex offender. She drove past the defendant's address and observed no car in the drive and learned from the Missouri Department of Motor Vehicles that Mr. Nolan had a non-driver's license ID card. The Missouri Sex Offender Registry identified 41 N. Henderson as the defendant's last known address. These steps taken by Officer Jackson confirmed the information received from Charter Communications.

The court finds the information in Officer Jackson's affidavit provided the issuing magistrate judge with "a fair probability that contraband or evidence of crime [would] be found in a particular place." Gates, 462 U.S. at 238, 103 S.Ct. at 2332. The issuing magistrate judge had probable cause to issue the search warrant. Thus, the search warrant was valid, based on probable cause. As a result, any evidence seized at the defendant's residence pursuant to the execution of the search warrant was validly seized, is admissible in evidence and should not be suppressed.

The court realizes that it is both the issuing magistrate judge and the reviewing judge which is not the ideal situation. The same judge is the only magistrate judge in the Southeastern Division of the Eastern District of Missouri and, as a result, is assigned the task of reviewing applications, making a judgment on probable cause and in the proper case, issuing a search warrant. He is also assigned all the pretrial motions of the criminal cases filed in the Southeastern Division and he files

reports and recommendations on motions to suppress.

However, each decision the magistrate judge makes concerning dispositive motions is reviewed de novo by the district judge who is the trial judge and the district judge will rule on any objections to the findings and recommendations of the magistrate judge. As a result, the defendant has an independent review available of the report and recommendation.

It is not necessary to call upon the Good Faith exception to the exclusionary rule offered by United States v. Leon, 468 U.S. 897 (1984), since the court finds the warrant was validly issued based on probable cause.

### Was the Interview Required to be Recorded?

Defendant claims as a matter of 21st Century Due Process the interview should have been recorded citing two state cases: Stefan v. State, 711 P.2d 1156 (Alaska 1985) and State v. Scales, 518 N.W.2d 587, (Minn. 1994).

As the government points out in Government's Memorandum in Opposition to Defendant's Motion to Suppress Statements and Evidence (Document #50), the Alaska ruling is based on "state due process." 711 P.2d at 1159, and the Minnesota decision resulted from the court's supervisory power to require interrogations to be recorded. 518 N.W.2d at 592. It did not determine whether the Due Process clause of the Minnesota Constitution required such a recording. Id. Neither state decision is binding on this court.

The Eighth Circuit Court of Appeals does control this court and was candidly cited by the defendant as not agreeing with his interpretation of what modern due process requires. While acknowledging that several states have so legislated, the Eighth Circuit held "there is no indication that such laws are constitutionally required." United States v. Williams, 429 F.3d 767, 772 (8th Cir.

2005). In response to Defendant Williams's request that the court fashion a rule requiring recording, the Eighth Circuit stated "We decline to do so." Id.

### **The Search Warrant Requirement for the Use of a GPS Device Does Not Apply to Peer-to-Peer Access to the Defendant's Computer**

The defendant's citation of United States v. Jones (No. 10-1259) in his argument that Lt. Mateja needed a search warrant to download images from the defendant's computer is misdirected. The Supreme Court, in Jones, held that in order to legally attach a GPS device to a suspect's vehicle law enforcement needed a search warrant.

On the contrary, Lt. Mateja's browsing and downloading of images from the defendant's computer was a peer-to-peer sharing. The nature of the peer-to-peer activity is that the files are made available for any other "peer" to receive. In her affidavit, Officer Jackson explained:

> To access the P2P networks, a user first obtains the P2P software, which can be downloaded from the Internet. This software is used exclusively for the purpose of sharing digital files. Once the P2P software is installed on a computer, the user is directed to specify a "shared" folder. All files placed in that user's designated "shared" folder are available to anyone on the world wide network for download. Most P2P software gives each user a rating based on the number of files she/he is contributing to the network. This rating affects the user's ability to download files. The more files a user is sharing, the greater his/her ability is to download files. This rating system is intended to encourage users to "share" their files, thus propagating the P2P network.

(Government's Exhibit #1A - Affidavit of Donya M. Jackson, ¶ 15).

As the affidavit explains, once the files are placed in the "shared" folder, they are available to anyone. "All files placed in that user's designated "shared" folder are available to anyone on the world wide network."

The files are no longer private. When Mr. Nolan placed the images in his shared folder, he was offering them to the world. Of course, the more he shared with others, the system is designed so that Mr. Nolan has access to more files from others.

Mr. Nolan's privacy was not invaded by Lt. Mateja because Mr. Nolan offered them to Lt. Mateja and to anyone else on the world wide network.

Thus, Lt. Mateja did not need a search warrant to unload the images.

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Statements and Evidence (Document #37) be denied.

The parties are advised that they have fourteen (14) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. <u>Thompson v. Nix</u>, 897 F.2d 356 (8th Cir. 1990).

_/s/ Lewis M. Blanton_
LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE

Dated this 6th day of March, 2012.